# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| JANE THURMAN on behalf of E. T., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10-CV-00559-NKL |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court is the Social Security Complaint of Jane Thurman on behalf of E. T. [Doc. # 3]. She seeks judicial review of the Social Security Commissioner's ("Commissioner") denial of her request for child's supplemental security income benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381, *et seq.* The Administrative Law Judge ("ALJ") found that E.T. was not under a disability since her alleged onset date of December 27, 2004 through November 4, 2008, the date of his decision. Such determination became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. Plaintiff has exhausted her administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 405(g). Because the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole, the Court denies Plaintiff's Petition.

I.     **Background**

A.     **Factual and Procedural History**[1]

E.T. was born in 1998. On December 27, 2004, at age 6, she was admitted to Children's Mercy Hospital and diagnosed with diabetic ketoacidosis and insulin dependent diabetes mellitus. Since then, she has not been hospitalized.

On June 24, 2005, E.T. was seen at the Western Missouri Medical Center's emergency room with a blood sugar reading of 506. On July 14, 2005, Dr. Y. Miles Yu, Pediatric Endocrinologist, wrote that he had evaluated E.T. and found that she had not achieved good glycemic control. Dr. Yu indicated E.T. continued to have persistent hyperglycemia during the afternoon and evening.

On August 5, 2005, E.T. was seen at the Western Missouri Medical Center with complaints of numbness to her arms, hands and legs.

On October 13, 2006, Dr. Laura Smith evaluated E.T. at the Children's Mercy Pediatric Ophthalmology Clinic. Dr. Smith noted that E.T. was having a visual field defect of uncertain etiology.

In November 2007, E.T. complained of increased headaches. On November 2, 2007, E.T. underwent an MRI due to her headaches. The impression stated on the radiology report was: "small arachnoid cyst in the right aspect with a posterior fossa measuring 1.9 centimeters in maximum dimension causing minimal mass affect on the right cerebellar

---

[1] The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

hemisphere. Otherwise, normal MRI of the brain without contrast." [Tr. 334]. On November 19, 2007, E.T. was evaluated by Dr. Gerry R. Gerry. Dr. Gerry noted that E.T. had experienced headaches off and on for approximately a year. Most of her headaches lasted for thirty minutes and she experienced associated visual changes. Dr. Gerry thought the cyst was a "benign finding" and did not cause E.T.'s headaches. [Tr. 460].

E.T.'s school records from her second grade year (2005-2006) show she performed below average on standardized tests, but that her teacher, Shannon Slinkard, was very pleased with her school performance and effort. E.T.'s grade cards show that she was independent in most of her academic subjects by the third quarter. Report card notes from the third quarter show that Ms. Slinkard believed E.T. had done a "great job," and she was impressed with E.T.'s effort. Ms. Slinkard also completed a questionnaire regarding Social Security's disability criteria. She indicated E.T. had some slight difficulty with some academic subjects, and that she needed assistance in some areas like acquiring and using information, and remaining on task. She did not indicate that E.T. had any limitations in any other area.

Ms. Slinkard indicated diabetes interfered with E.T.'s school performance "daily," but she also indicated it was only truly a problem if E.T.'s blood sugar was too high or too low. E.T. also frequently missed school, but it did not interfere with her school work. E.T.'s report card from fourth grade shows all As and Bs. In fact, she earned straight As on her second semester grade card.

E.T. checked her blood sugar four to eight times per day. E.T. testified that she visited

the school nurse daily upon arriving at school in the morning, both before and after lunch, and before she returned home. School nurse notes show E.T. sometimes had low or high blood sugar, which the nurse treated by suggesting a snack or drink of water, or by administering insulin. E.T.'s doctor noted that E.T. had difficulty moderating her blood sugar, but that she received good care at school because the school nurse was also diabetic.

E.T. testified that when her blood sugar was high she would be hyper and yell at her mom and dad. When her blood sugar was low she would feel shaky and cold and did not know what she was doing most of the time. About twice or three times a week, E.T. stated that she had needle-like feelings in her hands and feet, making it difficult and painful to walk and sometimes causing trouble when using her hands. E.T. also testified that she had really painful headaches about two or three times a week, which would go away within fifteen minutes of taking Aleve. About twice a month, the vision in her left eye would blur so that she couldn't see.

E.T.'s mother, Jane Thurman, described E.T.'s blood sugar episodes as continuous. The high episodes happened on a regular basis, approximately two to four times a day, causing E.T. to make more trips to the nurse's office. During high episodes, E.T. would whine, cry a lot, have trouble concentrating, and was not aware if someone was talking to her. E.T. averaged two to three hours a night with homework that she had missed throughout the day due to time spent in the nurse's office. According to E.T.'s mother, E.T. experienced low episodes once or twice a week where she would get very shaky and nervous. When E.T. got the "needle feeling" in her feet, E.T. was required to sit until she could feel her feet again.

4

E.T. continued to have problems with vision on some days, "but it's not like it was the very first time." [Tr. 39]. The Children's Hospital had talked to E.T.'s mother about the fact that E.T. was going through a grieving phase where she was angry because of her condition.

According to E.T.'s mother, E.T. would have to lay down with a cloth on her head in a dark room to relieve headaches if no Aleve was available. At the time of the hearing, E.T. got headaches two or three times a week. Also at the time of the hearing, E.T.'s thyroid was being monitored due to her hair loss.

E.T. was 7 years old at the time she filed her application for benefits where she alleged she was disabled due to brittle diabetes. At the hearing before the ALJ, E.T. testified that she was getting ready to start the fifth grade.

### B. The ALJ's Decision

To establish entitlement to child disability benefits, Plaintiff must show that E.T. is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(A). The Supreme Court in *Barnhart v. Walton*, 535 U.S. 212 (2002), upheld the Commissioner's interpretation of this statutory definition which requires that the disability, and not only the impairment, must have existed or be expected to exist for 12 months.

The Social Security disability analysis for children involves a three-step sequential evaluation. The Commissioner considers (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and

5

(3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment in the listings. *See* 20 C.F.R. § 416.924 (2010). At stage three, the Commissioner analyzes functional limitations in six domains: 1) Acquiring and using information; 2) Attending and completing tasks; 3) Interacting and relating with others; 4) Moving about and manipulating objects; 5) Caring for yourself; and 6) Health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i-vi) (2010). A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two of these domains or an "extreme" limitation in one of the domains. *See* 20 C.F.R. § 416.926a (2010).

The ALJ found that E.T. was not working and that she had the severe impairment of diabetes. However, the ALJ also found that E.T.'s impairment did not meet, medically equal, or functionally equal any listed impairment. Based on the record, the ALJ found that E.T. did not have any limitations in five of the six domains, and had only a marked limitation in the domain of health and physical well-being. Because E.T. did not have marked limitations in two domains, or an extreme limitation in any one domain, the ALJ found E.T. was not disabled.

Plaintiff raises only one argument on appeal. She asserts that the ALJ's decision is not supported by substantial evidence because the ALJ failed to appropriately assess E.T.'s health and physical well-being. [Doc. # 13, at 5]. Plaintiff contends that the ALJ should have found E.T. had an "extreme" limitation in the domain of health and physical well-being, rather than the "marked" limitation assessed by the ALJ.

6

## II. Standard of Review

In reviewing the Commissioner's denial of benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

## III. Discussion

In support of Plaintiff's sole argument that the ALJ improperly found that E.T. had only a marked limitation in health and physical well-being, Plaintiff states:

> The Plaintiff had numerous and repetitive visits to the school nurse due to her elevated blood sugars. She also had numbness, headaches and visual deficits. There is no basis for the conclusion that these limitations are marked and not extreme. Plaintiff's limitations very seriously interfere with her ability to initiate, sustain, or complete activities.

[Doc. # 13, at 8].

Health and physical well-being refers to "cumulative physical effects of physical and mental impairments and their associated treatments on a child's health and functioning." *See* "Title XVI: Determining Childhood Disability – The Functional Equivalence Domain of 'Health and Physical Well-Being'," Social Security Ruling 09-8p, 2009 WL 396030, at *2.

7

Rather than focusing on whether the claimant can perform normal age-appropriate milestones, health and physical well being "addresses how such things as recurrent illness, the side effects of medication, and the need for ongoing treatment affect a child's body; that is, the child's health and sense of physical well-being." *Id.*

A "marked" limitation is defined as an impairment that interferes seriously with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i) (2010). It also means a limitation that is "more than moderate" but "less than extreme," or "equivalent to standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* An "extreme" limitation is the rating given to the worst limitations and is defined as interfering very seriously with the claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i) (2010). An extreme limitation does not necessarily mean a total lack or loss of ability to function. *Id.* Standardized scores would be expected to be at least three standard deviations from the mean. *Id.* "Extreme" limitation is the rating given to the "worst limitations." *Id.*

Here, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the record shows that her impairment "very seriously"–as opposed to only "seriously"–interfered with her ability to independently initiate, sustain, or complete activities; i.e., E.T. suffered from an extreme limitation in the domain of health and well-being. However, Plaintiff points to nothing in the ALJ's reasoning that is error. The ALJ accurately noted that "medical records do not document that any treating physician has ever found or imposed any long-term, significant, and adverse physical limitations on [E.T.'s]

8

functional capacity." [Tr. 24]. Additionally, the ALJ noted that E.T.'s second grade teacher indicated that E.T. was a terrific student who gave good effort in all areas of school. The record also shows that E.T. received all A's and B's in fourth grade, indicating that E.T. was able to participate in normal school activities despite frequent visits to the nurse's office to manage her diabetes. Testimony at the hearing shows that E.T.'s headaches were manageable within fifteen minutes of taking pain medication; E.T. was able to resume her normal routine after waiting for numbness or "needle-like" feelings to subside; and the severity of E.T.'s visual deficits, which occurred about twice a month, has decreased. Moreover, Plaintiff identifies no activity in which E.T. was "very seriously" limited due to her high or low blood sugar episodes, numbness, headaches, and visual deficits, nor does she identify how her day-to-day functioning is very seriously limited by these impairments. *See* "Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule — The "Whole Child" Approach," Social Security Ruling 09-1p, SSR 09-1P, 2009 WL 396031 (rating of limitation in a domain is based on the answers to five listed questions).

For the foregoing reasons, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole.

### III. Conclusion

Accordingly, it is hereby ORDERED Plaintiff's Petition [Doc. # 3] is DENIED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: May 12, 2011
Kansas City, Missouri